### E. B. SMITH & CO. v. COLLINS et al.

(Circuit Court of Appeals, Third Circuit. November 21, 1908.)

#### No. 13, October Term, 1908.

1. PRINCIPAL AND AGENT (§ 152*)—REORGANIZATION COMMITTEE OF BONDHOLD-ERS—TIME LIMIT AFFIXED TO SIGNATURES OF REORGANIZATION AGREEMENT.
   Where, in signing, with others, an agreement depositing railway bonds with a reorganization committee pending foreclosure proceedings, certain bondholders affix a time limit after their signatures, a sale by the committee after that time was unauthorized and passed no title.
   [Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. § 152.*]

2. PRINCIPAL AND AGENT (§ 170*)—RIGHTS AS TO THIRD PERSONS—RATIFICA-TION BY ACQUIESCENCE OF PRINCIPAL OF SALE BY AGENT.
   The failure of certain owners of bonds of a railroad company, who had placed the same in the hands of a reorganization committee with power to sell them for a limited time, to make any objection to a sale made by the committee after the expiration of such time, of which they were at once notified, until after the bonds had been used by the purchasers in a purchase of the property more than three months later, was a ratification of the sale by acquiescence.
   [Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 641; Dec. Dig. § 170.*]

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

W. A. Glasgow, Jr., and Henry C. Boyer, for plaintiffs in error.
Reynolds D. Brown, for defendants in error.

Before DALLAS and GRAY, Circuit Judges, and ARCHBALD, District Judge.

ARCHBALD, District Judge. There are several peculiar things about this case. It was brought without the knowledge of the parties whose wrongs it is supposed to redress; the action is joint, although the injury to each of the two legal plaintiffs is necessarily individual and sole; it is brought, not against the agents of the plaintiffs, who in the first instance did the wrong by selling their bonds without authority, but against third parties, who dealt with them innocently and without notice, however they may be unable to set that up; and it proceeds, through the medium of two successive use parties, for the benefit of one who apparently did not come in till a year after everything had been done, and whose right to assert the wrongs of those whom he undertakes to represent it is somewhat difficult to understand. These things may not be particularly assigned for error, but the court below directed a verdict, so that the whole record is involved, and these lie on the surface. The other features will appear as we proceed.

The action is trespass, counting in trover, and sounding in damages, for the alleged conversion by the defendants of certain electric railway bonds. These bonds, with those of numerous others, were deposited by the plaintiffs, Collins and Arps, with a reorganization committee, pending foreclosure proceedings—Collins having $6,000 and Arps $1,000—and were sold by the committee to Groner and Taylor, who represented the defendants; the defendants in turn using them on a sale of the road to satisfy their bid as purchasers. The sale of the bonds by the committee was consummated January 27, 1906, and the same day a notice in writing was mailed to the various owners that a sale had been effected at 40 cents on the dollar, the price agreed upon, with the right, if any one so chose, to exchange his bonds for new bonds of the reorganized company. In the meantime, Collins, if not Arps, had sold and assigned to Zell, the first use plaintiff, his bonds in the hands of the committee, turning over the receipt which had been given for them, with the right to make demand therefor. The purchase by Zell of Collins was agreed to about the middle of January, but was not completed until February 3d, at which time the money was paid, and the same day Zell also bought and paid for the bond of Arps; the price in each instance being $33\frac{1}{3}$ cents on the dollar. These bonds, with those of others, were sought to be acquired by Zell, the same as by the defendants Smith & Co., for the purpose of using them in buying in the road, with regard to which they were prospective rivals. The sale of the road was May 3 1906, the defendants being the successful purchasers, and the amount realized was sufficient to pay the bonds in full. This suit is based upon the fact that in executing the agreement to deposit their bonds with the reorganization committee Collins and Arps added, after their signatures, " 'til Jan. 1, '06," and " 'til .... '06," respectively, thus putting

a time limit, as it is claimed, on their concurrence, after which, according to this, a sale by the committee was unauthorized and conveyed no title, the bonds remaining the property of the owners and passing to Zell by his purchase; the use of them by the defendant Smith & Co. to comply with their bid amounting to a conversion, which made them liable in damages for their value.

The construction of the agreement which is so contended for, and which was adopted by the court below, in our judgment, is the correct one. The time limit imposed extended to the whole instrument, and was not confined to a part of it, being the same as though written into the body of it. After January 1, 1906, therefore, however short the time may seem for effecting the purpose of the agreement after its execution, the reorganization committee were without authority to dispose of the plaintiffs' bonds as they did, and if there was nothing more in the case we should be compelled to hold that the defendants took no title. We also agree that Collins and Arps were not required at once to recall their bonds from the committee nor to notify them of that of which they were informed by the express terms of the agreement, and that they could leave their bonds in the committee's hands for a reasonable time without the risk of having them disposed of.

But, immediately after effecting a sale, the committee, as we have seen, mailed notices of it to Collins and to Arps, along with the others whom they represented, which notice was presumptively received by each shortly afterwards; and that Zell knew of it within a day or two there can be no question. All the parties concerned were thus made aware of the action of the committee and the disposition which they had made of the bonds, as well as the contemplated use of them to buy in the property, and it thereupon became their duty to disavow, within a proper time, that which had been done in their names, unless they intended to accept and abide by it. Otherwise they ratified it by apparent acquiescence. Bredin v. Du Barry, 14 Serg. & R. (Pa.) 27; Auge v. Darlington, 185 Pa. 111, 39 Atl. 845. Instead of this, however, there is evidence that they did not repudiate it, if at all, until long afterwards, after the sale of the road and the use of the bonds by the defendants in the purchase of it. It was assumed otherwise by the court below, and a verdict for the plaintiffs directed on the strength of it. But that is not the record, as we understand it, and that there may be no mistake we quote the evidence. Thus Mr. Arps testifies:

"Q. Are you, Mr. Arps, one of the plaintiffs in the suit of Collins and Arps against Edward B. Smith & Co., pending in the Circuit Court of the United States for the Eastern District of Pennsylvania? A. I did not know that I was. * * * I was not aware that I was bringing suit against anybody. * * * Q. Did you demand back from the committee at any time after the 1st of January, 1906, the bond which you had delivered to them? A. I don't think that I did. Q. Did you, at any time prior to the assignment of your pool receipt, notify the committee that they had acted without authority in selling your bond, and repudiate the contract which they had made? A. No."

To the same effect, substantially, is the testimony of Mr. Collins:

"Q. Did you ever notify the committee that they had no right to sell your bonds and repudiate the contract? A. No; I don't think I did. Q. Did you,

at any time after January 1st and before making the assignment to Mr. Zell, call on the committee for the redelivery to you of the bonds which you had deposited with them? A. I don't remember that I ever did. * * * Q. Mr. Collins, have you ever at any time repudiated the contract made by the pool committee with Messrs. Groner and Taylor of January 25th and advised them of such repudiation? A. I don't think so. I don't think I ever have. I don't recall it."

So Mr. Cobb, one of the committee:

"Q. Did Mr. Arps or Mr. Collins advise you or the committee, so far as you know, that the contract made by you with Groner and Taylor of January 25th, in so far as their bonds were concerned, was unauthorized? A. I don't remember their doing so. Q. Did Mr. Arps or Mr. Collins make any demand on you between January 1st and January 25th * * * for those bonds which they had deposited previously with your committee? A. No; no one did."

And Mr. Groner, who with Mr. Taylor bought the bonds for Smith & Co.:

"Q. Did you ever hear from Mr. Arps or Mr. Collins any objection to that contract being made with you? A. Never in the slightest degree."

And Mr. Taylor, also:

"Q. When did you first find out that any claim was made by assignees of Arps and Collins that they were entitled to these $8,000 of bonds? A. Some time about the 5th or 6th of February Mr. Groner and myself received a notice from Mr. Zell setting up a claim to some of the bonds. Q. Did you know whether those were Arps' and Collins' bonds? A. I could not say of my own knowledge. Q. When was the first you heard of those bonds? A. Claiming them in terms, designating them? Q. Yes. A. Some eight or nine months, I should say, subsequent to this transaction."

Even Mr. Burr, whose testimony is particularly relied on by the plaintiffs, is no more conclusive:

"Q. In the early part of 1906 whom did you represent, if anybody, who had any interest in this Bay Shore Terminal controversy? A. I represented Mr. Zell and Mr. Van Dyke. Q. At or about that time did you or did you not have any talks with Mr. Norris, of the defendant firm? A. I had two or three conversations in early February, 1906. Q. Did you have any talk with him at or about that time with reference to what we call here the Collins and Arps bonds or receipts? A. I had a conversation with him, not naming them by name, but referring to the fact that the power of attorney contained several bondholders who had limited the time within which the power should operate."

This last is denied by Mr. Norris, who says that according to his best recollection no objection was made by Mr. Burr to the validity of the sale to his firm on the ground that the power of the committee had run out and that he had never heard of it until the present suit. But, giving Mr. Burr's testimony its full force, as there were others besides Collins and Arps who had affixed time limits to their signatures, there was no particular significance in what he said upon that subject. And much less, even if it was more to the point than it is, was there anything like a repudiation of the sale of the bonds by the committee; the only thing being a possible question of its validity.

The only other evidence of any apparent relevance is the written notice given by Zell, in which he made formal demand for these bonds, excepting them out from other bonds which he represented or was possessed of. But that notice was not until January 11, 1907, nearly a year afterwards, which was altogether too late, of course, to avoid

the effect of the intermediate acquiescence. If there was anything bearing on the subject in the bill in equity filed by Zell to March term, 1906, in the common pleas of Philadelphia, which is referred to in the notice, it has not been brought to our attention, and, indeed, the bill in equity, not having been offered in evidence, is not before us.

We are unable to see how, upon this showing, a verdict for the plaintiffs could have been directed. It may be that, if found by the jury upon submission to them of the question of acquiescence, such a verdict would have been sustainable. But upon that we express no opinion. The right to recover is recognized, as, indeed, it must be, as depending on the rights of Collins and Arps, and, if so, their failure to act, unless excused, is fatal. And even if this be saved by what was done by Zell, the assignor of Van Dyke, in that behalf, and he, by his purchase of the bonds and the transfer to him of the receipts of the committee, acquired the right to pursue and recover them wherever found, and to prosecute any one dealing with them as for a conversion, still even as to him the question of ratification was for the jury and could not in our judgment be taken from them.

Some stress is laid on the fact that the money to be paid by the defendants for the bonds has not yet been turned over, being held at their instance by the trustees, awaiting the result of this litigation. But that does not relieve the situation. It may enable the defendants to protect themselves to that extent in case they are held liable here; but it does not change the fact or the effect of the previous acquiescence.

The judgment is reversed, and a venire facias de novo awarded.